**KAPLAN FOX & KILSHEIMER LLP**
Joel B. Strauss
Ariana J. Tadler
800 Third Avenue
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-687-7714
*jstrauss@kaplanfox.com*
*atadler@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
William J. Pinilis
160 Morris Street
Morristown, NJ 07960
Telephone: 973-656-0222
*wpinilis@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King*
Matthew B. George*
Blair E. Reed*
Sophia V. Pintar*
**Pro hac vice* applications forthcoming
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*
*mgeorge@kaplanfox.com*
*breed@kaplanfox.com*
*spintar@kaplanfox.com*

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOSEPH SAWYER, on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRIZETTO PROVIDER SOLUTIONS, LLC and COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION,<br><br>Defendants. | Case No.: 2:26-cv-2698<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph Sawyer ("Plaintiff"), by and through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendants TriZetto Provider Solutions, LLC ("TriZetto") and Cognizant Technology Solutions Corporation ("Cognizant") (collectively, "Defendants") and makes the following allegations based upon knowledge as to himself and his own acts, and upon information and belief as to all other matters, as follows:

**INTRODUCTION**

1. On or about November 2024, Defendants, Cognizant, and its wholly owned subsidiary, TriZetto, which provides software services to hundreds of thousands of healthcare providers,[1] and thus hundreds of millions of patients, experienced a breach within its data storage system containing millions of patients' highly sensitive personal and health information including: names, primary insureds, addresses, dates of birth, Social Security numbers, health insurance member numbers, Medicare beneficiary numbers, health insurer names, information about primary insureds and beneficiaries, and other demographic health and health insurance information (the "Data Breach"). TriZetto reportedly determined that over 3.4 million patients' information was exposed.[2]

---

[1] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/.

[2] *Id.*

2. Defendants learned of this Data Breach nearly a year later, after healthcare providers, customers of Defendants, informed them of suspicious activity while they were trying to access their TriZetto software systems.[3] Therefore, for *nearly a year*, cybercriminals had access to view, collect and share highly sensitive personal information to be sold or traded on the dark web. At the very least, Defendants failed to carry out the most basic responsibilities of protecting Plaintiff's and Class Members' Private Information.[4]

3. Even after investigating the Data Breach, Defendants only started notifying hospitals and healthcare providers of the situation on or around December 2025.[5] Defendants failed to inform affected individuals that their highly sensitive information was exposed to unauthorized actors and cybercriminals.

4. Defendants only notified affected individuals directly in a notice letter dated February 6, 2026, (the "Breach Notice) and even then simply informed recipients that their information was involved in a "cybersecurity incident."[6]

5. Plaintiff brings this action on behalf of all United States residents whose Private Information was compromised because of Defendants' failure to:

---

[3] *Id.*

[4] Private Information is defined at pp. 6-7.

[5] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/.

[6] https://oag.ca.gov/system/files/TriZetto%20Data%20Breach%20Notification%20Letter%2012.22.2025%20-%20scanned.pdf.

(i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware and software that contained protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct violates the common law and violates federal and state statutes.

6. Plaintiff and Class Members have suffered injury because of Defendants' conduct. Defendants store highly sensitive information, and the breach of this data leads to injuries such as: (i) damages for the unauthorized and unconsented use of their Private Information; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) other consequential damages as a result of the violation of Defendants' duties to Plaintiff and Class Members; and (iv) the continued and substantially increased risk to their Private Information which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information. Plaintiff and Class Members have a continuing interest in ensuring that

their information is and remains safe, and they are entitled to injunctive and other equitable relief.

## PARTIES

7. Plaintiff Joseph Sawyer is a resident of North Carolina. Mr. Sawyer received the Breach Notice letter from TriZetto dated February 6, 2026, stating that his information was compromised by the Data Breach and may have included, among other things, sensitive information including his "health insurance member number…..health insurer name, primary insured information, and other demographic, health and health insurance information."

8. Defendant Cognizant Technology Solutions is a business incorporated under the laws of the state of Delaware with its principal place of business in New Jersey, at 300 Frank Burr Blvd, Suite 600, Teaneck, NJ 07666. Defendant conducts business in New Jersey and throughout the United States.

9. Defendant TriZetto Provider Solutions is a limited liability corporation and a wholly owned subsidiary of Defendant Cognizant Technology Solutions. Defendant TriZetto's principal place of business is 3300 Rider Trail S., Earth City, Missouri 63045. Defendant conducts business in North Carolina, New Jersey and throughout the United States.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11. This Court has personal jurisdiction over Defendants because they operate and are headquartered in this District and conduct substantial business in this District.

12. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District, have intentionally availed themselves of the laws and markets within this District through their promotion, marketing, and business activities in this District, and a significant portion of the facts and circumstances giving rise to Plaintiff's Complaint occurred in or emanated from this District.

## FACTUAL ALLEGATIONS

### A. Defendants Collect, Store, and Profit from Their Customers' Private Information and Promised to Keep It Secure

13. Cognizant is a multinational technology company with over 350,000 employees and $20 billion in annual revenue that provides software services to 350

major healthcare systems and manages 4.4 million healthcare providers' transactions annually.[7]

14. TriZetto Provider Solutions is a healthcare management services provider that was acquired by Cognizant in 2014[8] and provides revenue management services to over 875,000 healthcare providers and systems throughout the United States.[9]

15. Defendants claim they strive to "act as the heartbeat of our clients' practices" by "working to positively disrupt the healthcare industry"[10] with services that can "realize[] increase[d] revenue, turn valuable data into action insights and revolutionize patient management."[11] TriZetto also touts that over 200 million patients are supported by its services to various providers.[12]

16. While providing software services to these hundreds of thousands of providers, Defendants know that their clients will use their services to collect and

---

[7] https://www.cognizant.com/us/en/industries/healthcare-technology-solutions#spy-overview; https://www.globaldata.com/company-profile/cognizant-technology-solutions-corp/.

[8] https://www.trizettoprovider.com/who-we-are/our-story.

[9] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/; https://www.trizettoprovider.com/.

[10] https://www.trizettoprovider.com/who-we-are/our-story.

[11] https://www.trizettoprovider.com/who-we-serve/physician-practices.

[12] *Id.*

handle patients' personally identifiable information ("PII") and personal health information ("PHI") (collectively referred to herein as "Private Information").

17. PII is defined by the Federal Trade Commission. The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendants, not every type of information included in that definition was compromised in the Data Breach.

18. Further, PHI is defined by statute. Under the Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d, *et seq*., and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103.

19. Additionally, business health information such as diagnoses, treatment information, medical test results, and prescription information are considered

protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information.[13] TriZetto is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

20. In their Privacy Notice, Defendants acknowledge that their clients have specific privacy rights that protect their information. [14] As a wholly owned subsidiary of Cognizant, TriZetto's Privacy Policy is that of Cognizant's.[15]

21. Among other things, Defendants maintain that they implement "appropriate security measures designed to prevent unlawful or unauthorized Processing of Personal Information and accidental loss of or damage to Personal Information."[16]

22. They also claim to maintain "written security management policies and procedures designed to prevent, detect, contain, and correct violations of measures

---

[13] Summary of the HIPAA Privacy Rule, Department for Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

[14] https://www.cognizant.com/en_us/general/documents/cognizant-privacy-notice.pdf.

[15] https://www.trizettoprovider.com/who-we-are/our-story. Clicking "Privacy Policy" at the bottom of the screen takes you to the Cognizant Privacy Policy page.

[16] *Id.*

taken to protect the confidentiality, integrity, availability, or security of your Personal Information."[17]

23. Thus, Defendants understood the need to protect patient's Private Information, and prioritize data security.

24. Defendants are required to provide their Privacy Notice to Plaintiff and Class Members before collecting and storing their Private Information.[18]

25. Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained. Plaintiff and Class members had a reasonable expectation that Defendants would keep their Private Information secure, confidential, and protected from bad actors. Defendants owed a duty to Plaintiff and Class Members to secure their patients Private Information in Defendants' software services.

26. Despite recognizing their duty to do so, on information and belief, Defendants have not implemented reasonable security safeguards or policies to protect their clients, and their clients' patients' Private Information, or trained their IT or security employees to prevent, detect, and stop breaches of their systems. As a

---

[17] *Id.*

[18] U.S. Dept. of Health and Human Services, *Notice of Privacy Practices for Protected Health Information*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/privacy-practices-for-protected-health-information/index.html.

result, Defendants leave significant vulnerabilities in their systems for cybercriminals to exploit and gain access to patients' Private Information. Had Defendants properly monitored their systems and employed appropriate security measures commensurate with the sensitivity of the Private Information Defendants knew was in their care, they would have either discovered the intrusion sooner, or would have prevented it entirely.

**B. The Data Breach**

27. According to news reports and reports by affected healthcare providers, beginning in November 2024, an unauthorized individual began accessing patient records related to insurance eligibility transactions in Defendants' database.[19]

28. It was not until October 2, 2025 – nearly a year later – that Defendants claim that they were made aware of the Data Breach, when Defendants' clients noticed suspicious activity on their web portals to access Defendants' software program.[20] Defendants failure to promptly identify malicious activity on its systems is a sign of demonstrably ineffective data security protocols that fall well below the industry standards necessary to maintain Private Information in compliance with state and federal law.

29. When Defendants were finally aware of the Data Breach, they

[19] Gardner Health Services Plan Notice of TriZetto Data Breach.

[20] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/.

conducted a forensic investigation, which determined that hackers successfully infiltrated data storage that contained the Private Information of patients of Defendants' healthcare provider clients.[21]

30. Defendants' internal review of the Data Breach found that cybercriminals accessed and obtained various patients' Private Information, including: names, primary insureds, addresses, dates of birth, Social Security numbers, health insurance member numbers, Medicare beneficiary numbers, health insurer names, information about primary insureds and beneficiaries, and other demographic health and health insurance information.

31. For nearly a year, Defendants did nothing while Plaintiff and Class Members' Private Information was exposed to hackers, leaving Plaintiff and Class Members uninformed about the Data Breach, while their Private Information was likely offered for sale to criminals on the dark web and unauthorized parties accessed and viewed Plaintiff's and Class Members' unencrypted, unredacted Private Information, including their highly sensitive health and healthcare information.

32. Defendants did not initially notify affected individuals directly; instead, starting on December 9, 2025, they notified their clients of the Data Breach, and gave them a list of their affected patients.[22] Defendants then expected their clients,

[21] *Id.*

[22] *Id.*

whom they failed in their initial duty to maintain a secure data system and prevent the Data Breach, to and that they would notify affected patients and policy holders for them.[23]

33. Defendants finally issued the Breach Notice to affected individuals in the Breach Notice dated February 6, 2026 – over four months after the alleged discovery of the Data Breach.[24]

34. Neither Defendants' notices to their clients, or affected patients, or any of their public statements include any information about the cause of the Data Breach, the vulnerabilities exploited, or any remedial measures that Defendants have taken so that such a breach does not occur again.

35. Defendants' initial investigation estimated that more than 700,000 individuals were affected, but it has now been confirmed that the Data Breach exposed over 3.4 million patients Private Information, making it one of the largest healthcare data breaches of 2025.[25]

36. Besides violating several breach notification laws, Defendants' failure to provide timely notice demonstrates that they did not have adequate data security protocols to even know the scope of the Data Breach.

---

[23] *Id.*

[24] https://oag.ca.gov/system/files/TriZetto%20Data%20Breach%20Notification%20Letter%2012.22.2025%20-%20scanned.pdf.

[25] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/.

37. Defendants' inadequate Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell their victims how many people were impacted, the identity of the cybercriminals who perpetrated this Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have never been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is and remains protected.[26]

38. Although Defendants downplay the incident with qualifiers like "potentially" and "may," Defendants should have known that cybercriminals intentionally targeted them for the highly sensitive Private Information they store on their information systems and databases, attacked and bypassed an insufficiently secured network, and exfiltrated the highly sensitive Private Information of the victims. As a result, the Private Information of Plaintiff and Class Members remain in the hands of cybercriminals.

39. Indeed, if Defendants had implemented and maintained reasonable, industry standard alerting systems like endpoint detection and response ("EDR"), extended detection and response ("XDR"), data loss prevention ("DLP"), and Security Information and Event Management ("SIEM"), Defendants likely would

---

[26] https://oag.ca.gov/system/files/TriZetto%20Data%20Breach%20Notification%20Letter%2012.22.2025%20-%20scanned.pdf.

have recognized the malicious activity on their information systems and databases in time to stop the Data Breach before the hackers could steal Plaintiff's and the proposed Class Members' highly sensitive Private Information.

40. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

41. Defendants knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Private Information misuse.

42. The exposed Private Information of Plaintiff and Class Members can — and likely will — be sold or traded on the dark web or other underground markets. Hackers can offer for sale the unencrypted, unredacted Private Information to criminals. Plaintiff and Class Members now face an imminent and lifetime risk of identity theft and fraud.

43. Additionally, because of Defendants' delayed response, Plaintiff and Class Members had no idea their Private Information had been compromised for over a year, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

44. On information and belief, after collecting patients' Private Information, Defendants maintained that Private Information in their computer systems unencrypted and without adequate security controls in place to identify potential unauthorized access.

45. Defendants also store medical records, insurance information, and other Private Information for their clients' patients, including records of treatments and diagnoses, lab results, and prescription information.

46. By collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants explicitly and implicitly agreed to safeguard the data using reasonable means according to their internal policies and federal law. As such, Defendants knew or should have known that they were responsible to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

47. Defendants failed in their duties on or before November 2024, when their inadequate security practices resulted in the Data Breach which allowed cybercriminals to view and collect patients' Private Information from their databases.[27]

48. Defendants admit in their Breach Notice that they believe the files accessed by cybercriminals included patients' Private Information.

---

[27] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/.

49. Despite their duties and alleged commitments to safeguard Private Information, Defendants do not follow industry standard practices in securing patients' Private Information, as evidenced by the Data Breach.

50. Cybercriminals need not harvest a person's Social Security number or financial account information to commit identity fraud or misuse Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages—or elements of stolen personal information bundled together—which can then be used to commit identity theft or fraud.

51. Moreover, the compromise of Plaintiff's and Class Members' PHI immediately expose victims to specific types of health care fraud, including fraudsters securing medical treatment, elective surgeries, and filled prescriptions in the victims' names. According to Allstate, "medical identify theft has an annual economic impact of around $41 billion a year."[28]

52. Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly

---

[28] Allstate Identity Protection, *Why is the Healthcare Industry the Biggest Victim of Identity Theft and Data Breaches?*, Business Insight (updated September 26, 2025) https://www.allstateidentityprotection.com/business/content-hub/whyhealthcare-industry-biggest-victim-of-identity-theft-and-data-breaches.

maintain and safeguard their databases and patients' data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches;

b. Failing to adequately protect patients' Private Information;

c. Failing to properly monitor their own data security systems for existing intrusions, including through the use of EDR, XDR, DLP, and SIEM tools;

d. Failing to train their employees in the proper handling of emails containing the means by which the cyberattacks were able to first access TriZetto's networks, and to maintain adequate email security practices;

e. Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

f. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

g. Failing to comply with HIPAA; and

h. Failing to adhere to industry standards for cybersecurity.

53. Through their Breach Notice, Defendants recognized the actual

imminent harm and injury that flowed from the Data Breach by offering victims Credit Monitoring, Fraud Consultation, and Identity Theft Restoration services to provide victims alerts for only 12 months.[29] The monitoring offered by Defendants is incomplete and inadequate to address Plaintiff's and Class Members' harm as a result of the Data Breach, especially considering how long it can take for fraud to actually occur after the initial Data Breach. Indeed, it took nearly 12 months for Defendants to even notify Plaintiff and Class Members of the breach.

54. Defendants' offered monitoring and consultation does not compensate Plaintiff and Class Members for damages incurred and time spent dealing with the Data Breach, the lost value of their Private Information, or the consequential damages necessary to put Plaintiff and Class Members in the position they would have been in but for the Data Breach.

### C. The Data Breach Was a Foreseeable Risk and Defendants Were on Notice

55. Plaintiff and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as new registrations to websites, opening a new bank account, loan applications, tax filings, mortgage applications, or any number of important financial transactions.

[29] https://oag.ca.gov/system/files/TriZetto%20Data%20Breach%20Notification%20Letter%2012.22.2025%20-%20scanned.pdf.

56. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $1 to $4,000.[30]

57. Criminals can also purchase access to entire company data breaches from $900 to $4,500.[31] This damage is equivalent to the repeated sale of a non-exclusive license to Plaintiff's and Class Members' Private Information.

58. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

59. This data demands a much higher price on the black market. "According to reports, medical information is worth more than 10x-40x times more than [] credit card number[s] on the black market[.] Especially when records contain a social security number which, unlike a credit card number, never changes."[32]

---

[30] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, Experian (June 30, 2025) https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[31] *For Sale in the Dark*, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark.

[32] *Why Medical Records are 10 Times More Valuable Than Credit Card Info*, CyberPolicy https://www.cyberpolicy.com/cybersecurity-education/why-medical-records-are-10-times-more-valuable-than-credit-card-info.

60. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

61. Defendants' data security obligations were also particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the Data Breach.

62. When electronic health records fall into cybercriminals' hands, it gives them "a full picture to commit insurance fraud, identity theft and other malicious activity in the future."[33] In fact, these records provide such valuable information that hackers can sell these stolen medical records for up to $1,000 each.[34]

63. Because of the value of its collected and stored data, the medical industry and its service providers experience disproportionally higher numbers of data theft events than other industries.

64. According to an article in The HIPAA Journal posted on November 2, 2023, patient records like those stolen from Defendants, are "often processed and packaged with other illegally obtained data to create full record sets (the previously mentioned Fullz package) that contain extensive information on individuals, often

---

[33] Heidi Mitchell, *Why Hackers Want Your Health Information*, The Wall Street Journal (December, 3, 2024) https://www.wsj.com/health/healthcare/why-hackers-want-your-health-information-.

[34] *Id*.

in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[35]

65. These significant increases in attacks to companies, particularly those in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendants.

66. A study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[36] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[37]

67. Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when

---

[35] Steve Adler, Editorial: Why Do Criminals Target Medical Records, The HIPAA Journal (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

[36] Brian O'Connor, *Health Care Data Breach: What to Know About Them and What to Do After One*, Experian (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one.

[37] *Id.*

it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

68. Like the GAO's study, the Federal Trade Commission ("FTC") found that it takes the majority of victims upwards of three months to resolve the problems from the attack.[38]

69. As the fraudulent activity resulting from the Data Breach may not come to light for years, Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[38] Harvi Ravichandran, *How Long Does it Take to Recover from Identity Theft?*, Aura (August 28, 2024) https://www.aura.com/learn/how-long-does-it-take-to-recover-from-identity-theft.

### D. Defendants Failed to Comply with HIPAA

70. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[39]

71. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information is properly maintained.[40]

72. The Data Breach itself resulted from a combination of inadequacies showing Defendants failed to comply with safeguards mandated by HIPAA. Defendants' security failures include, but are not limited to:

a. Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably-anticipated threats

[39] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[40] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the

covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

73. Simply put, the Data Breach resulted from a combination of insufficiencies inadequacies and failures that demonstrated Defendants failed to comply with safeguards mandated by HIPAA regulations.

**E. Defendants Failed to Comply With FTC Guidelines**

74. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

75. In 2023, the FTC updated its publication, Start With Security: A Guide for Business, which established cyber-security guidelines for businesses, and

enforced the guidelines outlined in their 2016 publication, Protecting Personal Information: A Guide for Business. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; test for their network's vulnerabilities; and implement policies to correct any security problems.[41]

76. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs and monitor incoming traffic for activity indicating someone is attempting to hack the system.

77. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

78. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to

[41] Federal Trade Comm'n, *Start with Security: A Guide for Business* (Aug. 2023), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

79. Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**F. Defendants Failed to Comply with Industry Standards**

80. As shown above, experts studying cybersecurity routinely identify healthcare providers and their service providers as being particularly vulnerable to data breaches because of the value of the Private Information which they collect and maintain.

81. To prevent and detect unauthorized cyber-attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures: implement an awareness and training program; enable strong spam filters to prevent phishing emails from reaching the end users; authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and

DomainKeys Identified Mail (DKIM) to prevent email spoofing; scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users; configure firewalls to block access to known malicious IP addresses; patch operating systems, software, and firmware on devices; consider using a centralized patch management system; set anti-virus and anti-malware programs to conduct regular scans automatically, among many other recommendations.

82. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures: ensure applications and operating systems (OSs) have been updated with the latest patches; attempt to independently verify website addresses before entering; be vigilant in opening email attachments from unknown senders; verify email senders; keeping informed of recent cybersecurity threat; install antivirus software, firewalls and email filters, among other recommendations. [42]

83. Defendants made the choice to collect and store the Private Information of Plaintiff and Class Members, and therefore could and should have implemented all the above measures to prevent and detect cyberattacks.

84. Defendants failed to meet the minimum standards of any of the

[42] Cybersecurity and Infrastructure Security Agency, *Protecting Against Ransomware* (April 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (revised Sept. 2, 2021).

following frameworks: the NIST Cybersecurity Framework Version 2.0, which outlines the following: integrating cybersecurity with enterprise risk management; understanding all legal and regulatory cybersecurity requirements; conduct regular cyber risk assessments; train employees on cybersecurity awareness; protect data with encryption and integrity controls; continuously improve cyber threat detection capabilities, among many other measures.[43]

85. The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

**PLAINTIFF'S EXPERIENCES**

86. Plaintiff Sawyer has obtained medical services through various providers that are business associates and/or affiliates of the Defendants at the time of the Data Breach. Plaintiff's Data Breach notification letter did not advise him which of his providers were the specific physicians that shared his medical information with Defendants.

87. In the course of obtaining medical treatment from healthcare providers that used Defendants' software services, Plaintiff Joseph Sawyer was required,

---

[43] National Institute of Standards of Technology, *The NIST Cybersecurity Framework (CSF) 2.0*, (February 26, 2024) https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.29.pdf (last visited March 11, 2026).

directly or indirectly, to provide his Private Information, including name, Social Security number, date of birth, and address, among other information. When providing and trusting Defendants with his Private Information, Plaintiff Joseph Sawyer reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

88. In the course of obtaining treatment, Defendants' business associates that provided medical services were required to provide their Privacy Notice to Plaintiff before collecting his Private Information.

89. Upon information and belief, at the time of the Data Breach, Defendants retained Plaintiff's Private Information in their systems.

90. Plaintiff Joseph Sawyer learned of the Data Breach via the Breach Notice from Defendants dated February 6, 2026.

91. In the letter, Defendants stated that Plaintiff's Private Information may have been involved in a "cybersecurity incident."[44]

92. As a result of the Data Breach, Plaintiff Joseph Sawyer has and will continue to take reasonable precautions to mitigate the impact of the Data Breach, including, but not limited to: researching and verifying the legitimacy of the Data Breach upon receiving the Breach Notice; monitoring his credit report; managing

[44] https://oag.ca.gov/system/files/TriZetto%20Data%20Breach%20Notification%20Letter%2012.22.2025%20-%20scanned.pdf.

disruptive scam emails on a regular basis; reviewing and remaining vigilant against medical care fraud. Plaintiff Joseph Sawyer has spent significant time dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

93. To date, Plaintiff Joseph Sawyer has spent hours on efforts to react to and protect himself from harm resulting from the Data Breach. Plaintiff values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

94. Had Plaintiff Joseph Sawyer been informed of Defendants' insufficient data security measures to protect his Private Information, he would not have willingly provided his Private Information to Defendants and/or their business associates. Given the highly sensitive nature of the Private Information stolen, and its likely subsequent dissemination to unauthorized parties, Plaintiff has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff anticipates spending considerable time on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

95. Plaintiff Joseph Sawyer suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) damages for

unauthorized disclosure of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; (ix) using credit monitoring, as ongoing protection is necessary to mitigate the heightened risk of identity theft and financial fraud resulting from the Data Breach; and (x) the continued and certainly increased risk to his Private Information, which remains unencrypted and available for unauthorized third parties to access and abuse; and remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

96. The Data Breach has caused Plaintiff Joseph Sawyer to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's pertinent facts.

97. As a result of the Data Breach, Plaintiff Joseph Sawyer is and will continue to be at increased risk of identity theft and fraud for years to come.

98. Upon information and belief, Defendants continue to store and/or share Plaintiff Joseph Sawyer's Private Information in their internal systems. Thus, Plaintiff has a continuing interest in ensuring that his Private Information is protected

and safeguarded from future breaches.

**A. Plaintiff and Class Members Suffered Damages**

99. Defendants have a duty to keep Private Information confidential and to protect it from unauthorized access and disclosures. Plaintiff and Class Members provided their Private Information to Defendants with the understanding that Defendants and any business partners to whom Defendants disclosed Private Information would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

100. The Data Breach creates a heightened security concern for patients who gave their Private Information to Defendants because their Private Information, including Social Security numbers, medical records and other sensitive financial and personal data was included.

101. Medical privacy is among the most important tenets of American healthcare. Patients must be able to trust their physicians, insurers, pharmacies, and any other service provider to protect their medical information from improper disclosure including, but not limited to, their health conditions and courses of treatment. Indeed, numerous state and federal laws require this.

102. What's more, it took over a year for Defendants to learn of the Data Breach, and three months from the time Defendants purportedly learned of the Data Breach for individuals who were affected to find that out.

103. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

104. Theft of Social Security numbers creates a particularly alarming situation for victims because those numbers cannot easily be replaced. Indeed, the Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[45]

[45] *See Identity Theft and Your Social Security Number*, Social Security Administration, https://www.ssa.gov/pubs/EN-05-10064.pdf.

105. It is also difficult to obtain a new Social Security number. A breach victim would have to demonstrate ongoing harm from misuse of her Social Security number, and a new Social Security number will not be provided until after the harm has already been suffered by the victim.

106. Given the highly sensitive nature of Social Security numbers, theft of these numbers in combination with other personally identifying information may cause damage to victims for years.

107. Defendants had a duty to keep Private Information confidential and to protect it from unauthorized disclosures. Plaintiff and Class Members provided their Private Information to Defendants with the understanding that Defendants and any business partners to whom Defendants disclosed Private Information would comply with their obligations to keep such information confidential and secure from unauthorized disclosures.

108. Defendants' data security obligations were particularly important given the substantial increases in data breaches in recent years, which are widely known to the public and to anyone in Defendants' industry.

109. Data breaches should be anticipated by companies that store sensitive and personally identifying information, and these companies must ensure that data privacy and security is adequate to protect against and prevent known attacks. Indeed, many health care companies have been subject to numerous data security

incidents, such as Anthem and Premera Blue Cross.

110. It is well known among companies that store sensitive Private Information that sensitive information is valuable and frequently targeted by criminals.

111. Identify theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

112. With access to an individual's Private Information, criminals can commit all manners of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and Social Security number to obtain government benefits, or filing a fraudulent tax return using the victim's information.

113. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web and the "cyber black-market" for years. As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen Social Security numbers and other Private Information directly on various illegal websites making the information publicly available, often for a price.

114. Moreover, a study found that the "average total cost" of medical identity theft is "about $13,500" per victim, and took victims on average 210 hours to resolve the problems.[46]

115. Defendants are, and at all relevant times have been, aware that the Private Information they handle and store in connection with providing healthcare software services is highly sensitive. As companies that handle highly sensitive Private Information, Defendants are aware of the importance of safeguarding that information and protecting their systems and products from security vulnerabilities.

116. Despite the known risk of data breaches and the widespread publicity and industry alerts regarding other notable data breaches, Defendants failed to take reasonable steps to adequately protect their systems from being breached leaving patients exposed to the risk of fraud and identity theft.

117. As a result of the events detailed herein, Plaintiff and Class Members suffered harm and loss of privacy, and will continue to suffer future harm, resulting from the Data Breach, including but not limited to: invasion of privacy; loss of privacy; loss of control over personal information and identities; disclosure of their need for special education; disclosure of financial status; fraud and identity theft; unreimbursed losses relating to fraud and identity theft; loss of value and loss of

[46] Tajammul Pangarkar, *Identity Theft Statistics by Reveal, Risks, Technology*, (January 13, 2026) https://scoop.market.us/identity-theft-statistics/.

possession and privacy of Private Information; harm resulting from damaged credit scores and information; loss of time and money preparing for and resolving fraud and identity theft; loss of time and money obtaining protections against future identity theft; and other harm resulting from the unauthorized use or threat of unauthorized exposure of Private Information.

118. As a result of the Data Breach, Plaintiff's and Class Members' privacy has been invaded, their Private Information is now in the hands of criminals, they face a substantially increased risk of identity theft and fraud, and they must take immediate and time-consuming action to protect themselves from such identity theft and fraud.

119. Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff's and Class Members' Private Information.

120. As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

121. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[47]

122. In their Breach Notice to patients, Defendants offered a 12-month complimentary membership to Kroll Credit Monitoring, Fraud Consultation, and Identity Theft Restoration to help detect possible misuse of personal information and provide identity protection support. Defendants also encouraged patients to place a fraud alert on their credit file and place a Security Freeze on their credit report.[48]

123. Defendants' failure to adequately protect Plaintiff's and Class Members' Private Information has resulted in Plaintiff and Class Members having to undertake these tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money.

124. Defendants' offer of identity monitoring to Plaintiff and Class Members is inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is

---

[47] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2021, October 2023, https://bjs.ojp.gov/document/vit21.pdf.

[48] https://oag.ca.gov/system/files/TriZetto%20Data%20Breach%20Notification%20Letter%2012.22.2025%20-%20scanned.pdf.

discovered, and also between when Private Information is acquired and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition and use of another person's Private Information) - it does not prevent identity theft.[49]

125. Plaintiff and Class Members have been damaged in several other ways as well. Plaintiff and Class Members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Private Information. Plaintiff and Class Members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Class Members may have also already purchased credit monitoring and other identity protection services, purchased credit reports, placed credit freezes and fraud alerts on their credit reports, and spent time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiff and Class Members also suffered a loss of the inherent value of their Private Information.

126. Private Information stolen in the Data Breach can be misused on its own, or it can be combined with personal information from other sources such as publicly available information, social media, etc., to create a package of information

[49] *See, e.g.*, Ron Shelvin, *Another Data Breach, More Credit Monitoring. There's a Better Solution*, Forbes Magazine (August 20, 2024) https://www.forbes.com/sites/ronshevlin/2024/08/19/another-data-breach-more-credit-monitoring-theres-a-better-solution/.

capable of being used to commit further identity theft. Thieves can also use the stolen Private Information to send spear-phishing emails to Class Members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

127. As a result of Defendants' failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

a. The compromise, publication, theft and/or unauthorized use of their Private Information;

b. Potential out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

d. The continued risk to their Private Information, which

remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the Private Information in their possession;

e. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

f. Anxiety and distress resulting from fear of misuse of their Private Information.

128. In addition to a remedy for the economic harm, Plaintiff and Class Members need significant injunctive and declaratory relief because they maintain an undeniable interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

**CLASS ACTION ALLEGATIONS**

129. Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of all others similarly situated.

130. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> **<u>Nationwide Class:</u>** All persons in the United States subject to the Data Breach involving Defendants that occurred in November 2024.

131. The North Carolina Subclass that Plaintiff seeks to represent is defined as follows:

> **<u>North Carolina Subclass:</u>** All persons in North Carolina subject to the Data Breach involving Defendants that occurred in November 2024.

132. Plaintiff reserves the right to modify, change, or expand the Class and Sub-Class definitions, including proposing additional subclasses, based on discovery and further investigation.

133. Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants have a controlling interest, and their current or former employees, officers, and directors; (3) counsel for Plaintiff and Defendants; and (4) legal representatives, successors, or assigns of any such excluded persons.

134. The Classes meet all of the criteria required by Federal Rule of Civil Procedure 23(a).

135. <u>Numerosity</u>: The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, it appears that the membership of the Classes

are in the tens of thousands. The identities of Class members are also ascertainable through Defendants' records.

136. Commonality: Common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to, the following:

a. Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

c. Whether and when Defendants actually learned of the Data Breach;

d. Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

e. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

f. Whether Defendants adequately addressed and fixed the

vulnerabilities which permitted the Data Breach to occur;

g. Whether Defendants were negligent or negligent *per se*;

h. Whether Defendants acted with intentional, knowing, reckless, or malicious behavior;

i. Whether Plaintiff and Class Members are entitled to relief from Defendants as a result of Defendants' misconduct, and if so, in what amounts; and

j. Whether Class Members are entitled to injunctive and/or declaratory relief to address the imminent and ongoing harm faced as a result of the Data Breach.

137. Typicality: Plaintiff's claims are typical of the claims of the Classes he seeks to represent, in that the named Plaintiff and all members of the proposed Classes have suffered similar injuries as a result of the same misconduct alleged herein. Plaintiff has no interests adverse to the interests of the other members of the Classes.

138. Adequacy: Plaintiff will fairly and adequately protect the interests of the Classes and has retained attorneys well experienced in class actions and complex litigation as counsel, including cases alleging breach of privacy and negligence claims arising from corporate misconduct.

139. The Classes also satisfy the criteria for certification under Federal Rule of Civil Procedure 23(b) and 23(c). Among other things, Plaintiff avers that the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendants; that the prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; that Defendants have acted or refused to act on grounds that apply generally to the proposed Classes, thereby making final injunctive relief or declaratory relief described herein appropriate with respect to the proposed Classes as a whole; that questions of law or fact common to the Classes predominate over any questions affecting only individual members and that class action treatment is superior to other available methods for the fair and efficient adjudication of the controversy which is the subject of this action. Plaintiff also avers that certification of one or more subclasses or issues may be appropriate for certification under Federal Rule of Civil Procedure 23(c). Plaintiff further states that the interests of judicial economy will be served by concentrating litigation concerning these claims in this Court, and that the management of the Classes will not be difficult.

140. Plaintiff and other members of the Classes have suffered damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants' unlawful and improper conduct shall, in large measure, not go remedied. Absent a class action, the members of the Classes will not be able to effectively litigate these claims and will suffer further losses.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence

141. Plaintiff realleges each and every allegation contained above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

142. Plaintiff brings this claim on behalf of the Class, or in the alternative, the North Carolina Sub-Class.

143. Defendants negligently represented that they would safeguard Private Information despite leaving Plaintiff's and the Classes' Private Information exposed to unauthorized access.

144. Defendants were entrusted with, stored, and otherwise had access to the Private Information of Plaintiff and Class Members.

145. Defendants knew, or should have known, of the risks inherent to storing the Private Information of Plaintiff and Class Members, and to not ensuring that their

products and services were secure. These risks were reasonably foreseeable to Defendants.

146. Defendants owed duties of care to Plaintiff and Class Members whose Private Information had been entrusted to them.

147. Further, after discovering that cybercriminals had infiltrated their systems, Defendants failed to timely notify patients, consequently, causing notice to Plaintiff and Class and Sub-Class Members to be untimely and insufficient to identify what Private Information had been exposed.

148. Defendants had additional duties to safeguard Plaintiff's and Class and Sub-Class Members' data through the following statutes and regulations:

a. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class and Sub-Class Members' Private Information.

b. Pursuant to HIPAA, 42 U.S.C. § 1320d, Defendants had a duty to securely store and maintain the Plaintiff's and Class and Sub-Class Members' PHI.

149. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also

because Defendants are bound by industry standards to protect confidential Private Information.

150. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect the Plaintiff's and Class and Sub-Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class and Sub-Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Allowing unauthorized access to and exfiltration of Plaintiff's and Class and Sub-Class Members' Private Information;

d. Failing to timely detect that Plaintiff's and Class and Sub-Class Members' Private Information had been compromised;

e. Failing to provide timely notice that Plaintiff's and Class and Sub-Class Members' Private Information had been compromised so those at risk could take timely and appropriate steps to mitigate the potential for identity theft and other damages; and

f. Failing to provide adequate notice of what Private Information

had been compromised so that Plaintiff and Class and Sub-Class Members at risk could take timely and appropriate steps to mitigate the potential for identify theft and other damages.

151. It was foreseeable to Defendants that their failure to use reasonable measures to protect Plaintiff's and Class and Sub-Class Members' Private Information would result in injury to Plaintiff and Class and Sub-Class members. Further, the breach of security was reasonably foreseeable given the known high frequency of ransomware attacks and data breaches.

152. It was additionally foreseeable to Defendants that failure to timely and adequately provide notice of the Data Breach would result in Plaintiff and Class and Sub-Class Members not being afforded the ability to timely safeguard their identities.

153. Defendants breached their duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate data security in connection to their services. Defendants had a duty to safeguard Plaintiff's and Class Members' Private Information and to ensure that their systems and products adequately protected the Private Information.

154. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

155. Defendants acted with wanton disregard for the security of Plaintiff's and Class Members' Private Information.

156. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

157. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury, including but not limited to: (i) potential identity theft; (ii) the loss of the opportunity to know and permit how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) potential out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) the continued risk to their Private Information, which may remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information in their continued possession; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the

lives of Plaintiff and Class Members.

158. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members face an increased risk of future harm.

159. Plaintiff is entitled to compensatory and consequential damages suffered as a result of the Data Breach.

160. Plaintiff is also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security programs and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide robust and adequate credit monitoring to all Class members for an appropriate and extended period, and any other relief this Court deems just and proper.

161. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members and are entitled to damages in an amount to be proven at trial.

**COUNT II**
**Negligence *Per Se***

162. Plaintiff realleges each and every allegation contained above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

163. Plaintiff brings this claim on behalf of the Class, or in the alternative, the North Carolina Sub-Class.

164. Pursuant to the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, Defendants had a duty to provide adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

165. Pursuant to HIPAA, 42 U.S.C. § 1320d, Defendants had a duty to securely store and maintain the Plaintiff's and Class and Sub-Class Members' PHI.

166. Pursuant to other state and federal laws requiring the confidentiality of Private Information, including, but not limited to, the FTC Act and HIPAA, among other laws, Defendants had a duty to implement reasonably safeguards to protect Plaintiff's and Class Members' Private Information.

167. Defendants breached their duties to Plaintiff and Class Members under the FTC Act and HIPAA, among other laws, by failing to provide fair, reasonable, or adequate data security in order to safeguard Plaintiff's and Class Members' Private Information.

168. Defendants' failure to comply with applicable laws and regulations stated above constitutes negligence per se.

169. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

170. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew

or should have known that they were failing to meet their duties, and that their breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

171. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members face an increased risk of future harm.

172. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**Breach of Express and/or Implied Contract**

173. Plaintiff realleges each and every allegation contained above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

174. Plaintiff brings this claim on behalf of the Class, or in the alternative, the North Carolina Sub-Class.

175. Plaintiff and Class Members provided their Private Information to Defendants with the explicit and implicit understandings that Defendants would take precautions to protect that Private Information from unauthorized disclosure.

176. Plaintiff and Class Members are parties to contracts with Defendants. Under the circumstances, recognition of a right to performance by Plaintiff and Class Members is appropriate to effectuate the intentions of the parties to these contracts.

One or more of the parties to these contracts intended to give Plaintiff and Class Members the benefit of the performance promised in the contracts.

177. Defendants breached these express and/or implied agreements, which directly and/or proximately caused Plaintiff and Class Members to suffer substantial damages.

178. Accordingly, Plaintiff and Class Members are entitled to damages, restitution, disgorgement of profits and other relief in an amount to be proven at trial.

## COUNT IV
## Invasion of Privacy

179. Plaintiff realleges each and every allegation contained above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

180. Plaintiff brings this claim on behalf of the Class, or in the alternative, the North Carolina Sub-Class.

181. Plaintiff and Class Members had a legitimate and reasonable expectation of privacy with respect to their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

182. Defendants owed a duty to patients, including Plaintiff and Class Members, to keep their Private Information confidential.

183. The unauthorized release of Private Information, especially the type

related to medical information, is highly offensive to a reasonable person.

184. The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiff and Class Members privately disclosed their Private Information to Defendants as part of their use of Defendants' services with the intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiff and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

185. The Data Breach constitutes an intentional interference with Plaintiff's and Class Members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

186. Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate and would likely result in a data breach such as the one that harmed Plaintiff and Class Members.

187. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and Class Members.

188. As a proximate result of Defendants' acts and omissions, Plaintiff's and

Class Members' Private Information was disclosed to and used by third parties without authorization in the manner described above, causing Plaintiff and Class Members to suffer damages.

189. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that the Private Information maintained by Defendant can be viewed, distributed, and used by unauthorized persons.

190. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class Members.

**COUNT V**
**North Carolina Identity Theft Protection Act,**
**N.C. Gen. Stat. §§ 75-60, *et seq*.**

191. Plaintiff realleges each and every allegation contained above and incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

192. Plaintiff brings this claim on behalf of himself and the North Carolina Sub-Class.

193. Defendants are businesses that own or license computerized data that includes "Personal Information" (for the purpose of this count, "Private Information") within the meaning of N.C. Gen. Stat. § 75-65.

194. Plaintiff and Sub-Class Members are "consumers" as defined by N.C. Gen. Stat. § 75-61(2).

195. Defendants are required to accurately notify Plaintiff and Sub-Class Members if they discover a security breach, or receive notice of a security breach (where unencrypted and unredacted Private Information was accessed or acquired by unauthorized persons), without unreasonable delay under N.C. Gen. Stat. § 75-65.

196. Plaintiff and Sub-Class Members' Private Information includes "Personal Information" as covered under N.C. Gen. Stat. § 75-61(10).

197. Because Defendants discovered a security breach and had notice of a security breach (where Private Information was accessed or acquired by unauthorized persons), Defendants had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by N.C. Gen. Stat. § 75-65.

198. By failing to disclose the Data Breach in a timely and accurate manner, Defendants violated N.C. Gen. Stat. § 75-65.

199. A violation of N.C. Gen. Stat. § 75-65 is an unlawful trade practice under N.C. Gen. Stat. § 75-1.1.

200. As a direct and proximate result of Defendants' violations of N.C. Gen. Stat. § 75-65, Plaintiff and Sub-Class Members suffered damages, and will continue to suffer damages, as described above.

201. Plaintiff and Sub-Class Members seek relief under N.C. Gen. Stat. §§ 75-16 and 16.1, including treble damages and attorney's fees.

**COUNT VI**
**North Carolina Unfair Trade Practices Act,**
**N.C. Gen. Stat. §§ 75-1.1, *et seq.***

202. Plaintiff realleges each and every allegation contained above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

203. Plaintiff brings this claim on behalf of the North Carolina Sub-Class.

204. Defendants advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

205. Defendants engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, including:

a. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

b. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and Sub-Class Members'

Private Information, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Sub-Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, HIPAA, and other laws, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Sub-Class Members' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Sub-Class Members' PII, including duties imposed by the and the FTC Act, 15 U.S.C. § 45, HIPAA, and other laws;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Sub-Class Members' Private Information;

g. Failing to timely notify Plaintiff and Sub-Class Members of the

Data Breach violation under the North Carolina Identity Theft Protection Act, N.C. Gen. Stat. § 75-65.

206. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' Private Information.

207. Defendants intended to mislead Plaintiff and Sub-Class Members and induce them to rely on their misrepresentations and omissions.

208. Had Defendants disclosed to Plaintiff and Class Members that their systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Defendants were trusted with sensitive and valuable Private Information regarding hundreds of thousands of individuals, including Plaintiff, Class Members, and Sub-Class Members. Defendants accepted the responsibility of being a steward of this data while keeping the inadequate state of their security controls secret from the public. Accordingly, because Defendants held themselves out as maintaining a secure platform for Private Information data, Plaintiff, Class Members, and Sub-Class Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

209. Defendants acted intentionally, knowingly, and maliciously to violate

North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff and Sub-Class Members' rights.

210. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Sub-Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

211. Defendants' conduct as alleged herein was continuous, such that after the first violations of the provisions pled herein, each week that the violations continued constitute separate offenses pursuant to N.C. Gen. Stat. Ann. § 75-8.

212. Plaintiff and Sub-Class Members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, and attorneys' fees and costs.

**COUNT VII**
**New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, *et seq.***
**On Behalf of the Nationwide Class against Both Defendants**

213. Plaintiff and Class Members repeat the allegations contained in the preceding paragraphs as if fully set forth herein.

214. The New Jersey Consumer Fraud Act (the "NJCFA"), N.J.S.A.

§§ 56:8-1, *et seq.*, prohibits the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission, in connection with the sale or advertisement of any merchandise. The NJCFA applies whether or not any person has in fact been misled, deceived or damaged thereby. N.J.S.A. § 56:8-2.

215. Plaintiffs, Defendants, and Class Members are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

216. Defendants sell "merchandise," as defined by N.J.S.A. § 56:8-1, by offering software services to the public.

217. Defendants, operating in New Jersey, engaged in unconscionable and deceptive acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of health benefits services in violation of N.J.S.A. § 56:8-2, including but not limited to the following:

a. Misrepresenting material facts, pertaining to the sale of software services, to healthcare providers by representing that they would maintain adequate data security practices and procedures to safeguard Plaintiffs' and Class Members' Private Information from unauthorized disclosure, release, data breaches, and theft;

b. Misrepresenting material facts, pertaining to the sale of software services, to healthcare providers by representing that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiffs' and Class Members' Private Information;

c. Knowingly omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Plaintiffs' and Class Members' Private Information with the intent that Plaintiffs and Class Members rely on the omission, suppression, and concealment;

d. Engaging in unconscionable and deceptive acts and practices by failing to adequately monitor and audit the data security systems of its vendors and business associates and failing to maintain the privacy and security of Plaintiffs and Class Members' Personal Information in violation of duties imposed by and public policies reflected in the FTC Act and HIPAA;

e. Engaging in unconscionable and deceptive acts and practices by failing to disclose the Data Breach to Plaintiffs and Class Members in a timely and accurate manner in violation of N.J.S.A. § 56:8-163; and

f. Representing in their Privacy Notice that they have "measures to protect the confidentiality, integrity, availability, or security of [individuals'] Personal Information" when, in fact, Defendants failed to safeguard patients' information by failing to have adequate security measures in place to protect from the Data Breach.

218. The above unlawful and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

219. Defendants knew or should have known that their data security practices were inadequate to safeguard Plaintiffs' and Class Members' Private Information and that the risk of a data breach was highly likely. Defendants' actions in engaging in the above-listed unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

220. Plaintiffs and Class Members reasonably expected that Defendants would protect their Personal Information and reasonably expected that Defendants would provide truthful statements on their website and privacy policies, and that it would be safe to provide Defendants with their information. These representations

and affirmations of fact made by Defendants, and the facts they concealed or failed to disclose, are material facts that were likely to deceive reasonable consumers, and that reasonable consumers would, and did, rely upon in deciding whether or not to provide their information to Defendants.

221. As a direct and proximate result of Defendants' unconscionable and deceptive acts and practices, Plaintiffs and Class Members suffered an ascertainable loss in moneys or property, real or personal, as described above, including the loss of their legally protected interest in the confidentiality and privacy of their Personal Information.

222. Plaintiffs and Class Members seek relief under N.J.S.A. § 56:8-19, including but not limited to, injunctive relief, other equitable relief, actual damages, treble damages, and attorneys' fees and costs.

**COUNT VIII**
**New Jersey Customer Security Breach Disclosure Act,**
**N.J. Stat. Ann. §§ 56:8-163, *et seq.***
**On Behalf of the Nationwide Class against Both Defendants**

223. Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

224. Defendants compile or maintain computerized records that include Private Information on behalf of another business under N.J. Stat. Ann. § 56:8-163(b).

225. Plaintiffs' and Class Members' Private Information (including names,

addresses, and Social Security numbers) includes Private Information covered under N.J. Stat. Ann. §§ 56:8-163, *et seq.*

226. Under N.J. Stat. Ann. § 56:8-163(b), "[a]ny business . . . that compiles or maintains computerized records that include Private Information on behalf of another business or public entity shall notify that business or public entity, who shall notify its New Jersey customers . . . of any breach of security of the computerized records immediately following discovery, if the Private Information was, or is reasonably believed to have been, accessed by an unauthorized person." Because Defendants discovered a breach of its security system in which Private Information was, or is reasonably believed to have been, acquired by an unauthorized person and the Private Information was not secured, Defendants had an obligation to disclose the Data Breach in a timely and accurate fashion.

227. Defendants failed to disclose the Data Breach in a timely and accurate fashion, within the meaning of N.J. Stat. Ann. §§ 56:8-163, *et seq.*

228. By willfully, knowingly, and/or recklessly failing to disclose the Data Breach in a timely and accurate manner, Defendants violated N.J. Stat. Ann. § 56:8-163(b).

229. As a direct and proximate result of Defendants' violations of N.J. Stat. Ann. § 56:8-163(b), Plaintiffs and Class Members suffered the damages described above.

230. Plaintiffs and Class Members seek relief under N.J. Stat. Ann. § 56:8-19, including treble damages, attorneys' fees and costs, and injunctive relief.

## COUNT IX
## Declaratory Judgement

231. Plaintiff realleges each and every allegation above and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

232. Plaintiff brings this claim on behalf of the Class, or in the alternative, the North Carolina Sub-Class.

233. Plaintiff and the Class have stated claims against Defendants for common law torts and statutory violations.

234. Plaintiff and the Class have stated claims against Defendants for common law torts and statutory violations.

235. Defendants failed to fulfill their obligations to provide adequate and reasonable data security measures for the Private Information of Plaintiff and the Class, as evidenced by the Data Breach.

236. As a result of the Data Breach, Defendants' systems are more vulnerable to access by unauthorized parties and require more stringent measures to be taken to safeguard the Plaintiff's and Class Members' Personal Information going forward.

237. An actual controversy has arisen in the wake of the Data Breach regarding Defendants' current obligations to provide data security measures that will

adequately protect Plaintiff's and Class Members' Private Information.

238. Plaintiff seeks a declaration that Defendants must implement specific additional, prudent, industry-standard data security practices to provide reasonable protection and security to Plaintiff and Class Members' Private Information. Specifically, Plaintiff and the Class seek a declaration that Defendants' existing security measures do not comply with their obligations, and that Defendants must implement and maintain reasonable data security measures on behalf of Plaintiff and the Class to comply with their data security obligations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the Classes, pray for relief as follows:

A. For an Order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23 against Defendant, appointing Plaintiff as Class Representative of the Class and/or Sub-Classes;

B. Awarding monetary, punitive and actual damages and/or restitution, as appropriate;

C. Awarding declaratory and injunctive relief as permitted by law or equity to assure that the Classes have an effective remedy, including enjoining Defendant from continuing the unlawful practices as set forth above;

D. Prejudgment interest to the extent allowed by the law;

E. Awarding all costs, experts' fees and attorneys' fees, expenses and costs of prosecuting this action; and

F. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

DATED: March __, 2026

**KAPLAN FOX & KILSHEIMER LLP**

By: */s/ Joel B. Strauss*
Joel B. Strauss

Joel B. Strauss
Ariana J. Tadler
800 Third Avenue
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-687-7714
*jstrauss@kaplanfox.com*
*atadler@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
William J. Pinilis
160 Morris Street
Morristown, NJ 07960
Telephone: 973-656-0222
*wpinilis@kaplanfox.com*

KAPLAN FOX & KILSHEIMER LLP
Laurence D. King*
Matthew B. George*
Blair E. Reed*
Sophia V. Pintar*
**Pro hac vice* applications forthcoming
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*
*mgeorge@kaplanfox.com*
*breed@kaplanfox.com*
*spintar@kaplanfox.com*

*Attorney for Plaintiff and the Proposed Class*